IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| KATHLEEN M. ZALEWSKI, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 06-1231 |
| PNC FINANCIAL SERVICES GROUP, INC., | ) ) ) ) | Judge Joy Flowers Conti Magistrate Judge Lisa Pupo Lenihan |
| Defendant. | ) | |

## **REPORT AND RECOMMENDATION**

### I. **RECOMMENDATION**

It is respectfully recommended that the Defendant's Motion for Summary Judgment as to the remaining claims be granted, as Plaintiff has not presented evidence from which a reasonable jury could find in her favor.

### II. **REPORT**

This case involves claims related to the employment and termination of Plaintiff, Kathleen M. Zalewski ("Plaintiff"), by Defendant, PNC Financial Services Group, Inc. ("PNC"). Plaintiff brought (a) federal and state claims of disability discrimination, including claims as to

both her termination and her employer's failure to accommodate her alleged disability; as well as (b) claims for failure to pay overtime in accordance with the Fair Labor Standards Act (the "FLSA"); (c) violations of the Employee Retirement Income Security Act ("ERISA"); and (d) violations of the Family and Medical Leave Act (the "FMLA"). All claims but those for failure to accommodate Plaintiff's alleged disability and failure to pay overtime required under the FLSA, have since been withdrawn.

Because no reasonable fact-finder could conclude - on the medical and other evidence before this Court - that Plaintiff was "substantially limited" in the performance of a major life activity at the time she requested reassignment to another supervisor and/or that Plaintiff required a reasonable disability accommodation of reassignment or relocation, this Report recommends that summary judgment be granted on this claim. Similarly, because no reasonable fact-finder could conclude, in light of the evidence to the contrary, that Plaintiff was outside the "administrative exemption" for overtime pay under the FLSA, this Report recommends that summary judgment be granted on this claim as well.

### A. Statement of Facts and Procedural History

This case was filed, in September 2006 and as noted above, as a civil action for relief in consequence of PNC's alleged discriminatory and/or retaliatory termination of, and preceding failure to accommodate, Plaintiff. It also alleged that PNC failed to pay Plaintiff overtime as required under the FLSA, violated ERISA by interfering with her health plan benefits, and violated the FMLA by terminating her for taking leave. All but the first of these three additional

counts were withdrawn in June 2007. Plaintiff's claim for discriminatory or retaliatory discharge under the Americans with Disabilities Act (the "ADA") and the Pennsylvania Human Relations Act (the "PHRA") was effectively withdrawn in Plaintiff's Response to Defendant's Motion for Summary Judgment.[1] The facts relevant to Plaintiff's remaining claims for failure to accommodate and failure to pay statutorily-requisite overtime, read in the light most favorable to Plaintiff, are as follows:

Plaintiff was employed by PNC from January 1992 until her termination in September 2005. In or before 2003, she was promoted to the position of Senior Accountant, and in March 2004 she was promoted to the position of Senior Financial Analyst.

Plaintiff suffers from epilepsy and depression. In March, 2004, her treating physician changed her seizure medication and she suffered related sleep disturbance/insomnia, which placed her at increased risk for a seizure.[2] She requested accommodation, including a work-at-home schedule, and PNC contacted her treating physician, Dr. Weisman. Plaintiff's physician responded that Plaintiff's seizure disorder was "well controlled and [he did] not believe it [had] any effect whatsoever on her ability to perform her employment duties" and that her condition was "under control with medication", with an excellent prognosis and she had "no limitations or medical restrictions pertaining to her employment" and "[did] not require any special accommodations or job modifications". See Defendant's Brief in Support, Ex. F (correspondence

---

1. See Plaintiff's Response to Defendant's Motion at 1 ("Based upon evidence accumulated during discovery it is clear the issue is one of failure to accommodate and not discriminatory discharge.").

2. Plaintiff experienced epileptic seizure in 1999 and again in March, 2004. See Plaintiff's Deposition ("Deposition") at 29-30.

from Dr. Weisman of March 9, 2004). PNC re-provided its Health Care Provider Questionnaire to Dr. Weisman, who replied on June 16, 2004, that although her "present drug [was] controlling her condition extremely well, [it was] producing insomnia" and that it would be "very beneficial" if she could work from home two days a week for the "next couple of months". PNC then permitted Plaintiff to alter her work schedule, including, *e.g.*, to work from home two days of the work week,[3] and to discontinue lunch hour and other workday overtime.[4] Excepting her subsequent request for reassignment accommodation giving rise to the instant action, Plaintiff does not allege any extended work absences or other need for accommodation owing to her epilepsy during her more than 13 year employment with PNC. She elected to discontinue working at home in November, 2004. See Deposition at 86.

In December, 2004, Plaintiff's supervisor, Mr. Didiano ("Didiano"), was instructing/training her in new computer spreadsheet job responsibilities.[5] During their interaction, Didiano repeatedly waved his hand in front of Plaintiff's face and queried "Hello? Are you getting this?" Plaintiff, who perceived this exchange as reflecting discriminatory animus

---

3. Plaintiff requested that she be allowed to work at home on Mondays and Fridays.

4. Plaintiff's testimony is that although PNC's Human Resources employee, Julie Paden, authorized her accommodations, including discontinuing any overtime, Plaintiff did not discontinue, but only reduced, her overtime work in March 2004. She asserts that she continued to work some amount of overtime thereafter. See, *e.g.*, Plaintiff's Response to Defendant's Motion at 3 (stating that "although she worked fewer hours than before March 2004, she nevertheless continued to work in excess of forty (40) hours in many workweeks"). As discussed, *infra*, claims under the FLSA's overtime provisions are generally subject to a two year statute of limitations which would, therefore, limit Plaintiff's claim to overtime hours worked after September 2004 (two years prior to the filing of her Complaint). A three year statute is applicable where the employer's violation was "willful."

5. See Deposition at 74-75.

4

because of her epilepsy, reported the incident the next day and requested reassignment to another supervisor/department.[6] Didiano was counseled/corrected by Ms. Fine-Sheriff, a PNC Employee Relations Consultant, with regard to sensitivity in his interactions with employees and avoidance of ambiguous and/or derogatory conduct.[7] He apologized to Plaintiff, and Plaintiff does not allege any other specific incidents of discriminatory conduct on his part.[8]

In March, 2005, Plaintiff advised her employer that she was suffering from depression, requested, and was granted a short-term disability medical leave of absence under the FMLA lasting the full thirteen (13) weeks of salaried leave available.[9] Upon her return to PNC on June

---

6. See Deposition at 77. Plaintiff requested that she be reassigned because the stress of continued interaction with Didiano would place her at increased risk for a seizure. Plaintiff also asserts that she was experiencing increased stress as a result of additional responsibilities which she assumed when PNC reduced the number of Analysts in her work group from six to five.

7. Plaintiff testified that Didiano was aware that she was experiencing cognitive problems at that time and that she was undergoing termination of an ectopic pregnancy. See Deposition at 78. Plaintiff's continued attempts to conceive were successful approximately 4-5 months later (*i.e.*, April 2005) and her son was born in January, 2006. At the time of her deposition, she had taken a part-time accounting position.

8. Plaintiff does allege further discrimination, however, on the basis of (a) a co-workers' placing a post-it note on her computer in May, 2004 reading "Where are you? Please resend Terria's reports to me asap"; (b) a coworker's suggestion that same month (after Plaintiff's temporary accommodation related to her change in medication, and implementation of a temporary work-at-home schedule) that members of the work group learn Plaintiff's responsibilities to help cover for her in the event of absence; and (c) Defendant's request for a re-submission of medical support for Plaintiff's need to work at home at that time. See also Defendant's Brief in Support, Ex. 1 (internal e-mail of June 25, 2004 regarding Plaintiff's identification to Julie Paden of the "coworkers who had been harassing" her). The Report concurs with Defendant's assertion that these instances fall objectively *far* short of evidence of discriminatory animus. See Defendant's Memorandum of Law in Support at 16-17. Cf. Ezold v. Wolf, Black, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992) (noting that stray remarks by non-decisionmakers are "rarely given weight").

9. Cf. Declaration re Reply Brief, Ex. 2 (Report of May, 2005 consultation with

(continued...)

3, a meeting with Plaintiff, an employment specialist, and an advocate from the Epilepsy Foundation was held and Plaintiff requested that, if she were not reassigned, her work station be relocated away from Didiano's. PNC declined to reassign Plaintiff to another supervisor or to relocate her work station away from Didiano, as she requested, but did provide Plaintiff with a third-party job coach to help her resume her work.[10] Documentation at that time indicates that Defendant was implementing a review process to determine (a) the job standards of Plaintiff's Senior Analyst position and (b) whether or not she could perform them. See Deposition at 83-84. Although Plaintiff reported to work the following week, *i.e.*, through June 10, she was then absent from work until June 28th, and her last day of work attendance was June 29. See Deposition at 59-60. The review process was never completed owing, by Plaintiff's admission, to her absence.[11]

---

9. (...continued)
neuropsychologist James Valeriano, noting that Plaintiff was unhappy with her prior neurologist, that "after her boss made critical comments [Plaintiff] elected to go out on short-term disability", and that Plaintiff was upset and did not feel like herself).

10. See Deposition Exhibit 16 (Accommodation Request Form dated June 3, 2005, noting Plaintiff's assertion that location of her workstation "exposes me constantly throughout the day to someone who has humiliated me by mocking my disability" and that this stress placed her at increased risk of seizure); id. (noting PNC's assessment that there was no medical documentation supporting Plaintiff's request, that there would be no clear benefit to relocating her work station as her job would require her to continue to work with Didiano, and that granting a request to be moved away from someone else in these circumstances would negatively impact the department/work environment).

The job coach was assigned by Competitive Employment Opportunities, through the Office of Vocational Rehabilitation. The Report of the employment specialist, Amy Johnson, who observed Plaintiff the week of June 6-10, was attached as Exhibit 15 to Plaintiff's Deposition.

11. The pleadings do not generally discuss whether this further absence was related to Plaintiff's epilepsy, depression, early pregnancy, or her dissatisfaction with Defendant's handling of her
(continued...)

6

In July 2005, PNC further reduced its workforce, and eliminated Plaintiff's position, reducing the Analysts positions in her work group from five to four.[12] Plaintiff offered to return to work in August, but was advised by PNC that it was not necessary for her to do so, and Plaintiff was paid through her effective termination date of September 18, 2005. Although others whose positions were terminated applied for and obtained replacement positions within PNC, and PNC had advised her that it would consider her application for another available position,[13] Plaintiff made no application.

---

11. (...continued)
request for reassignment or relocation. Cf Deposition Ex. 13 (Plaintiff's October 24, 2005 letter to the EEOC indicating that she suffered a "major health setback" in June 2005 owing to stress at work as a result of PNC's refusals of her requests); Deposition at 29 (testifying that Plaintiff was begun on Zoloft in May 2005 and that this medication was effective in treating her depression, as indicated in her physician's notes of October 2005).

    See Plaintiff's Response to Motion for Summary Judgment, Ex. 3 (PNC's internal e-mail dated July 7, 2005 noting that Plaintiff had exhausted her short term disability salary continuation under the FMLA); id. (internal e-mail dated May 3, 2005 noting that Plaintiff's physician had released her for return to work on June 2, 2005 without restriction).

12. See Letter of July 21, 2005 notifying Plaintiff of termination of her position. Plaintiff's work group supervisor, Didiano, was also terminated during this substantial, company-wide workforce reduction.

13. See Report of job coach, Amy Johnson of CEO, *supra*.

B. **Motion for Summary Judgment**

Summary judgment may only be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c). Summary judgment may be entered against a party who, after adequate time for discovery, has failed to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In considering a motion for summary judgment, the Court examines the facts in the light most favorable to the non-movant, and the party moving for summary judgment must show that the evidence of record is insufficient to carry the non-movant's burden of proof, *i.e.*, that there are no genuine issues of fact to be tried. Id.; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257-49 (1986). On a motion for summary judgment, however, the non-movant cannot rely solely on unsupported assertions or conclusory allegations. Id. at 249.

C. **Analysis**

**1. Failure to Accommodate**

To establish a *prima facie* claim for failure to accommodate under the ADA, Plaintiff must evidence that (1) she had a disability; (2) Defendant had notice of her disability; (3) she could perform the essential functions of her position with reasonable accommodation; which (4) Defendant failed to provide. See, *e.g.*, Lewis v. Commonwealth of Pennsylvania, 2007 WL 1247076, *5 (W.D. Pa. April 5, 2007).

a. Failure to Establish *Prima Facie* Disability

Plaintiff's epilepsy and depression are not, in themselves, sufficient to render her "disabled" under the ADA. See Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 195 (2002); Sterling v. McKesson Automation, Inc., 2006 WL 2792203, *6 (W.D. Pa. Sept. 26, 2006) (noting that epilepsy is not a *per se* disability under the ADA). Rather, Plaintiff must provide evidence that she was substantially limited in one or more major life activities. See 42 U.S.C. § 12102(2)(A); 29 C.F.R. § 1630.2(j). See also Kelly v. Drexel Univ., 1996 WL 479503, *2 (3d Cir. Aug. 23, 1996); Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 783 (3d Cir. 1998) (noting that determination of disability under the ADA requires an individualized assessment of impact on major life activities).[14] An individual is substantially limited if she is unable to perform, or "significantly restricted as to the condition, manner, or duration under which [she] can perform" a major life activity. 29 C.F.R. § 1630.2(j). See also Sever v. Henderson, 381 F.Supp. 2d 405 (M.D. Pa. 2005); Sterling, *supra*.[15] Factors considered under this standard include the nature and severity of alleged impairments, their duration/expected duration, and the degree of permanence/long-term impact. See 29 C.F.R. § 1630.2(j). "Impairments that

---

14. "Major life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. §1630.2(l). Thinking and concentrating are also major life activities. See Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999).

15. A plaintiff may also establish her disability status under the ADA by evidence that she was subject to discriminatory treatment by an employer which "regarded [her] as" having a substantially limiting impairment." In "regarded as" cases, the employer must perceive the individual as having an actual disability under the ADA, *i.e.*, a substantially limiting impairment. See Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999) (cited in Sterling, *supra*). Here, there is clearly insufficient evidence for a *prima facie* claim that Defendant regarded Plaintiff as substantially impaired. See discussion, *supra*.

9

result in only mild limitations are not disabilities." Kelly, 1996 WL 479503 at *4 (quoting EEOC Compliance Manual § 902-19).

To establish a substantial limitation in the major life activity of working, a plaintiff must show "significant restrict[ion] in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparative training, skills and abilities." Dlugos v. Eastman Kodak Co., 1996 WL 679411 (W.D. Pa. Sept. 5, 1996) (quoting Bolton v. Scrivner, Inc., 36 F.3d 939, 942 (10th Cir. 1994) (quoting 29 C.F.R. § 1630.2(j)(3)(l)). The question is, as Chief Judge Ambrose of this Court has noted, "whether [plaintiff] has adduced sufficient evidence from which a fact finder reasonably could conclude that the nature and severity of [her impairments] significantly restricted [her] ability to [perform a particular major life activity] as compared with an average person in the general population." Dlugos, 1996 WL 679411 (quoting the Third Circuit's discussion in Kelly, *supra*).

But Plaintiff's own testimony is that she had no difficulties with essential job performance. See Deposition at 102 (testifying that at no time after receiving accommodations in 2004 did Plaintiff feel she was unable to perform her essential job functions for health reasons). Moreover, the evidence of her long-term employment and her medical history do not support a significant/broad work restriction; and Plaintiff presents evidence demonstrating no other substantial limitation.[16] Accordingly, Plaintiff has not met her burden and she cannot maintain her ADA claim. See Dlugos, *supra* (granting summary judgment where employee of more than

---

16. As to other major life activities, Plaintiff has testified that she is able to care for herself, her son, and her home, to drive, to socialize, and to exercise; and that she has no difficulties with manual dexterity, learning or reading. See, *e.g.*, Deposition at 24-26.

12 years had attested that job performance was not affected by disability and employee could not otherwise, in light of medical evidence, establish a substantial limitation); Dawley v. Erie Indem. Co., 100 Fed.Appx. 877, 882 (3d Cir. 2004) (affirming summary judgment where employee testified that limitations did not affect performance of job-related duties); Shalbert v. Marcincin, 2005 WL 1941317 (E.D. Pa. Aug. 9, 2005) (grating summary judgment where employee testified that depression did not limit ability to function at work, drive, or care for herself); Sarko v. Penn-Del Directory Co., 268 F.Supp. 1026, 1035 (E.D. Pa. 1997), *aff'd* 189 F.3d 464 (3d Cir. 1999); Kocsis v. Multi-Care Management, Inc., 97 F.3d 883-84 (6th Cir. 1996) (affirming summary judgment where plaintiff testified she was capable of performing her employment duties). The Report notes that, even absent Plaintiff's deposition testimony of non-substantial limitation, Plaintiff's assertions of (a) temporary insomnia and delayed thought-processing related to a medication change in March, 2004, and (b) an increased risk of seizure owing to work stress, cannot - without more - establish her *prima facie* case. Cf. Sterling, 2006 WL 279220, *4-6 (concluding that plaintiff's allegations of sporadic/episodic difficulties related to epilepsy and depression, and medical documentation, did not support a substantial limitation in the ability to think, speak, or communicate due to epilepsy); id. at *6 (observing that conclusory allegations without competent evidence are insufficient to survive summary judgment and noting, amongst other things, plaintiff's work history). Compare Defendant's Memorandum of Law in Support at 11 (noting that all of Plaintiff's test results, including those for cognitive defects, were normal/unremarkable and that Plaintiff's physicians' evidence was that her conditions were well-controlled with medication); Declaration re Reply Brief, Ex. 2 (report of May, 2005

neuropsychology consultation with Dr. Valeriano, noting that Plaintiff's Cleveland Clinic EEG was normal); Deposition at 32 (noting normal MRI with Dr. Valeriano in May, 2005); Defendant's Brief in Support, Ex. 2 (physician's report of May 24, 2005 evaluation, noting that Plaintiff showed "intact ability to learn and retain information and generally [did] not show significant psychomotor slowing compared to others of similar age and educational background" but that the mood disturbance/symptoms she reported due to "unresolved issues regarding her work situation" would benefit from transfer to another position if possible);[17] Defendant's Brief in Support, Ex. 6 (Report by Dr. Diehl of Cleveland Clinic examination/consult in March, 2005, (1) noting that Plaintiff has focal epilepsy with "rare seizures"; (2) noting unremarkable speech, language, affect and cognition; and (3) recommending the following restrictions: no bathing, unsupervised swimming, use of heavy machinery or sharp moving objects, avoid heights and pregnancy as it relates to epilepsy and related medications).[18]

---

17. This treating physician's report does not provide medical support for a claim of ADA disability-based accommodation. To the contrary, it reflects an assessment of no substantial limitation, and simply notes that, given the emotionally-disturbing work issues that Plaintiff reported to her physician, transfer away from that personal conflict-situation would be beneficial, if possible. Compare Plaintiff's Concise Statement of Material Facts at 3 (asserting that Plaintiff's "physician requested, among other things, the accommodation of being reassigned to a new position"). See also Defendant's Response to Plaintiff's Concise Statement of Material Facts (discussing content of treatment notes, including that of Dr. Shramke); Plaintiff's Response to Defendant's Concise Statement at 49 (asserting, by way of medical support for reassignment, that "Dr. Shramke specifically refers to Plaintiff's desire to be transferred").

18. Although Plaintiff was diagnosed with, and treated for depression (both during and after her 2005 pregnancy), there is simply inadequate medical evidence of record to raise a material fact question of depression-based or other "disability" within the scope of the ADA. Cf. supra n. 11.

b. Failure to Establish *Prima Facie* Evidence of Request for Reasonable Accommodation

Even if Plaintiff had sufficiently evidenced her disability status under the ADA, which she has not, her claim for non-accommodation could not be maintained in the absence of evidence that her request was one for reasonable accommodation under the Act.

Plaintiff's contemporaneously documented request was that she be reassigned to another supervisor/department and/or that her cubicle be relocated away from Didiano. Although she asserts that this accommodation was necessary because the stress of continued interaction with Didiano placed her at increased risk of an epileptic seizure, Plaintiff submitted no medical evidence supporting that assertion. To the contrary, her treating physician indicated that Plaintiff's epilepsy was well-controlled by her medication. And Plaintiff represented that at the time of her request she could perform her job. See Deposition at 102.[19]

Because Didiano was the supervisor of Plaintiff's business unit, interaction with him was an essential function of that position. Cf. Gaul v. Lucent Technologies, Inc., 134 F.3d 576, 579 (3d Cir. 1998) (holding that requests for transfer away from individuals causing plaintiff stress

---

19. See also Deposition at 87 (Plaintiff's testimony that it was not satisfactory to her that Didiano could just apologize and "that could be the end of it"); Defendant's Brief in Support, Ex. 1 ({Plaintiff's e-mail of June 28, 2005, indicating that she would/could not accept that Didiano "made a mistake" and indicating that she felt she could not "forgive and forget" or trust either Didiano or PNC personnel employees); Defendant's Brief in Support, Ex. 13, p. 36 (Deposition of third-party job counseling provider, attendant at meeting, noting that Plaintiff indicated that she could complete her job responsibilities but did not want to work with her current supervisor); Defendant's Brief in Support, Ex. 14, pp. 28-33 (Deposition of Epilepsy Foundation advocate, attendant at meeting, testifying as to (a) absence of knowledge of Plaintiff's having any job restrictions owing to epilepsy and (b) understanding that job coach was, in this case, to assist employee-employer communications regarding additional job responsibilities and "strained" relation between Plaintiff and her direct supervisor).

13

were unreasonable as a matter of law).[20] To support a claim that Defendant was required to transfer Plaintiff to a *different* position or department, Plaintiff must present evidence that this was a reasonable and available accommodation. See, *e.g.*, Shapirao v. Township of Lakewood, 292 F.3d 356 (3d Cir. 2002); Donahue v. Consolidated Rail Corp., 224 F.2d 226, 233 (3d Cir. 2000). But Plaintiff has simply not provided sufficient evidence of either necessity/reasonableness or availability sufficient to maintain her *prima facie* claim. See Defendant's Memorandum of Law in Support at 21. Cf. Sterling, 2006 WL 2792203, *6 (granting summary judgment and noting that aside from "mere speculation and conclusory allegations", plaintiff had "not provided any competent evidence that could lead a reasonable factfinder to believe that Plaintiff's epilepsy substantially limits him in one or more major life activities or that Defendants perceived him as having an actual disability under the ADA").[21]

---

20. Although Plaintiff asserts that Defendant would not, as a matter of policy, provide reasonable accommodation by transfer to another position, a more accurate reading of its testimony/evidence is that it would not transfer an individual who could perform the essential functions of her present position, and that such a request was not "reasonable" under the ADA. See, *e.g.*, Deposition of Ms. Fine-Sheriff, attached as Exhibit H to Defendant's Brief in Support (testimony both before and after Defense counsel's incivilities at 38).

21. Plaintiff is correct in noting that an employer is obliged to engage in an interactive process to assess the necessity/reasonableness of accommodations, and an employee's ability to perform essential job functions. See Plaintiff's Response to Defendant's Motion at 5. Plaintiff also acknowledges, however, that this is a shared obligation. See id. at 6; *supra* (noting that Plaintiff absented herself from work shortly after her return from FMLA leave in early June, 2005, and did not return to work but for a day or two prior to her effective termination date in mid-September). Defendant reviewed Plaintiff's evidence of limitation in support of her request for reassignment/relocation and found it wanting; Plaintiff did not work with the support service provided to her, or submit evidence that reassignment was necessary; rather, she elected to discontinue interaction.

**2. FLSA Overtime**

Under the FLSA, an employee is exempt from overtime compensation under an "administrative exemption" if she meets a salary test (not in dispute) and is (a) an administrative worker, (b) whose work is of substantial importance to Defendant**,** and (c) whose primary duty includes work requiring the exercise of discretion and judgment. See Martin v. Cooper Electric Supply Co., 940 F.2d 896, 901-02 (3d Cir. 1991). The burden is on the employer to establish an exemption from FLSA overtime provisions. Id.

The FLSA is generally subject to a two-year statute of limitation. See 29 U.S.C. § 255(a). As Plaintiff's Complaint was filed on September 15, 2006, her claims for unpaid overtime are therefore limited to those for overtime worked from September, 2004 through her cessation of work in Summer 2005. Plaintiff can recover for overtime within a three-year period (*i.e.*, from September 2003 through Summer 2005) if Defendant "willfully" violated the FLSA. Willfulness requires a showing of a violation that was knowing or in reckless disregard of Plaintiff's rights under the FLSA. See McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988); Brock v. Richland Shoe Co., 699 F.2d 80, 83 (3d Cir. 1986). Defendant has adduced evidence, however, that its Compensation Consultants scrutinized the Job Profiles of the positions held by Plaintiff from February 2003 forward and determined those positions to be exempt. Cf. Deposition of Sharon Cercone (Exhibit 4 to Plaintiff's Response to Motion for Summary Judgment; Deposition attaches the Senior Analyst Job Profile as an exhibit and discusses Defendant's position exemption designation/review procedures). It has also adduced evidence that Plaintiff was performing work within the normal/typical parameters of her positions.

And, some protestations to the contrary notwithstanding, Plaintiff has self-described and/or acknowledged her "accounting professional"[22] job duties to encompass responsibilities that clearly place her positions within the administrative exemption to the FLSA's overtime provisions. See generally, Declaration re Reply Brief, Ex. 2 (report of May, 2005 neuropsychology consultation noting Plaintiff's reporting that she was a financial analyst and that her jobs at PNC had become increasingly "analytical"). More particularly, although Plaintiff contests her exercise of discretion/judgment within the administrative exemption,[23] she has self-reported that she "adjusted allocation methodologies . . . to ensure fairness" and comply with Corporate Standards, "developed controls to verify accuracy of financial information" after uncovering errors, performed "thorough variance analysis of all accounts to be presented to upper management", interacted with risk managers and ensured resolution of their issues/problems, and cross-trained others. See Declaration re Reply Brief, Ex. 3 (Performance Evaluation/Discussion Questionnaire completed by Plaintiff in October, 2002); id. (same, completed by Plaintiff in September, 2001, and identifying accomplishments as: "implemented more efficient procedures" that "eliminated reliance on other service partners", reconciled several months of incorrect investment entities via "ongoing correspondence with several service partners, as well as

---

22. See Defendant's Brief in Support, Ex. 1 (Plaintiff's e-mail of June 28, 2005).

23. As an accountant providing services to PNC's Insurance Group, Plaintiff provided "administrative" services regarding related insurance agencies; these services were ancillary to Defendant's banking and lending business and within the first prong of the administrative exemption. See Martin, *supra*. Plaintiff's job profile encompassed work clearly significant to PNC as required to meet the second prong. See id. For example, she compiled required reports for filings and audits, analyzed balance sheets and income statements, verified financial reports/data, and monitored millions of dollars in investments for accuracy/compliance.

continual analysis of Intrader reports", "identifi[ed] new procedure changes to adjust to the increased activity of the portfolios", "identified flaws in the investment subsystem and assisted the vendors in correcting them", and "trained new staff"); Defendant's Brief in Support, Deposition Ex. 9 (Plaintiff's resume, including PNC responsibilities of "assess[ing] the controls for monitoring third party arrangements with reinsurers and address[ing] any potential operational risks", "consult[ing] with risk managers to improve fairness of allocation methodologies, "assist[ing] in the budgeting process, and "monitor[ing] $65M investment portfolio for compliance . . . and accuracy"). These responsibilities necessarily encompassed an exercise of independent judgment and discretion. See Martin, *supra*. See also 29 C.F.R. § 541.200. And the Report notes Plaintiff's promotions and evidence that her job responsibilities and their analytical nature were increasing. See *supra*.[24] Thus, even if Plaintiff worked overtime within the statute of limitations period,[25] she was unentitled to FLSA overtime, as her job was

---

24. Cf. Deposition at 56 (Plaintiff's testimony that she understood herself to be an exempt employee at PNC from 1996 onward). Compare Plaintiff's Response to Defendant's Motion at 3 (asserting that Plaintiff was non-exempt because she "did not have the authority to exercise independent judgment on material matters and performed in most respects as a highly paid clerk"); Affidavit attached as Exhibit 2 to Plaintiff's Response to Motion for Summary Judgment (denying that Plaintiff performed the job duties described on the Job Profile or in Didiano's June 1, 2005 Memorandum, including training).

25. Cf. Deposition at 53-54 (Plaintiff's testimony, in response to questions regarding details of her overtime work, such as a specific time period, that she could only say she worked overtime for "several years" beginning in 2001 and that she made no calculation of her overtime hours); Deposition Exhibit 13 (Plaintiff's October 24, 2005 letter to the EEOC indicating that, as part of her accommodations in March, 2004, Plaintiff ceased participation in PNC's "compressed work week". Under that program, individuals could elect to work overtime and be compensated for it with a day off every two weeks.); Deposition Ex. 11 (Plaintiff's e-mail of May 13, 2004 indicating to Julie Paden that although Plaintiff voluntarily suspended working a CCW, she was still working 8:20-5:05).

clearly within the administrative exemption. The evidence before this Court does not support a question of material fact to the contrary.

### III. **CONCLUSION**

For the reasons set forth above, and on the basis of the evidentiary record before this Court, is respectfully recommended that the Defendant's Motion for Summary Judgment be granted.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrate Judges, the parties are allowed ten (10) days from the date of service to file objections to this Report and Recommendation. Any party opposing the objections shall have ten (10) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

  /s/ Lisa Pupo Lenihan
LISA PUPO LENIHAN
United States Magistrate Judge

Dated: November 16, 2007